**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**RAYMOND V. JACKSON, JR.,**

      **Plaintiff,**

      v.                                                **Civil Action No.: 5:11-cv-185**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

**REPORT AND RECOMMENDATION
THAT CLAIMANT'S MOTION FOR SUMMARY JUDGMENT BE DENIED AND
COMMISSIONER'S MOTION FOR SUMMARY JUDGMENT BE GRANTED**

## I. Introduction

A.    <u>Background</u>

Plaintiff, Raymond V. Jackson, Jr. ("Claimant"), filed his Complaint on December 30, 2011, seeking judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant, Commissioner of Social Security ("Commissioner").[1] Commissioner filed his Answer on March 7, 2012.[2] On April 5, 2012, Claimant filed a Motion for Judgment on the Pleadings.[3] On May 7, 2012, Commissioner filed a Motion for Summary Judgment.[4]

B.    <u>The Pleadings</u>

    1.    Claimant's Motion for Judgment on the Pleadings

    2.    Commissioner's Motion for Summary Judgment & Memorandum in Support

---

[1] Dkt. No. 1.

[2] Dkt. No. 8.

[3] Dkt. No. 11.

[4] Dkt. No. 12.

C.      <u>Recommendation</u>

I recommend that:

1.      Claimant's Motion for Judgment on the Pleadings be **<u>DENIED</u>** because substantial evidence supports the ALJ's residual functional capacity assessment

2.      Commissioner's Motion for Summary Judgment be **<u>GRANTED</u>** for the same reasons set forth above.

## II.  Facts

A.      <u>Procedural History</u>

Claimant filed an application for Disability Insurance Benefits on May 28, 2008, alleging disability since September 28, 2006 due to left leg amputation, back problems, arthritis, acid reflux, attention deficit disorder, and depression. (Tr. 162 ). The application was initially denied on September 10, 2008 and on reconsideration on January 6, 2009. (Tr. 83-89, 91-93). On February 19, 2009, Claimant requested a hearing before an ALJ and the hearing was held on May 18, 2010 in Morgantown, West Virginia. (Tr. 29-77).

On June 23, 2010, the ALJ issued a decision adverse to Claimant finding that he was not under a disability within the meaning of the Social Security Act. (Tr. 14-25). Claimant requested review by the Appeals Council, however on January 5, 2011, the Appeals Council denied Claimant's request for review. Claimant filed this action, which proceeded as set forth above, having exhausted his administrative remedies.

B.      <u>Personal History</u>

Claimant was born on May 28, 1957 and was 52 on the date of the May 18, 2010 hearing before the ALJ. (Tr. 36). Claimant has a college degree, has a veterinary license, and has work

experience running a part-time private veterinary practive. (Tr. 39, 162-63, 168). Claimant also has an above-the-knee left leg amputation from a hunting accident that occurred in 1972.

C.   Medical History

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's finding that Claimant is not under a disability and can still perform work in the national economy:

On January 18, 2006, Maro R. Schwabe, M.D. diagnosed Claimant with major depression and gave him a Global Assessment of Functioning (GAF) score of 60, indicating moderate difficulty in social/occupational functioning. (Tr. 252). On June 7, 2006, Dr. Schwabe noted that Claimant's condition had improved and he accorded him a GAF score of 70, indicating mild symptoms and some difficulty in social/occupational functioning. The on August 28, 2006, Dr. Schwabe again noted that Claimant's condition had improved, and he accorded him a GAF score of 80, indicating no more than a slight impairment in social/occupational functioning. (Tr. 250).

On September 28, 2006, Claimant went to the United Hospital Center's emergency room with complaints of back pain from lifting a dog at his veterinary clinic. (Tr. 213). While noting that he had a full range of motion in his extremities and no motor or sensory deficits, Christy Gain, PA-C diagnosed Claimant with lumbosacral strain and prescribed him a non-steroidal anti-inflammatory drug. (Tr. 214, 217). On October 30, 2006, Claimant saw Anna M. Allen, M.D. with complaints of dull, aching back pain and was diagnosed with lumbar radicular pain. (Tr. 219-21). On November 27, 2006, Claimant saw Michael Shramowiat, M.D. at the Mountaineer Pain Relief and Rehabilitation Centers for low back, lower extremity, and right hip pain. Dr.

3

Shramowiat diagnosed Claimant with lumbar disc herniation with myelopathy and lumbar radiculopathy. (Tr. 222-23). On December 18, 2006, Claimant returned to the Center and reported improvement in his low back and lower extremity pain. (Tr. 224)

On January 17, 2007, Dr. Schwabe again accorded Claimant a GAF score of 80. (Tr. 249). Also on January 17, 2007, Claimant again reported pain in his low back and pain in the anterior lateral aspect of the right thigh. He was continued on Vicodin and referred for an MRI of his lumbar spine. (Tr. 225). On February 14, 2007, an MRI of his lumbar spine showed lumbar intervertebral disc bulges at all levels except at the L4/5 level and a posterior annnular tear at the L5-S1 vertebrae disc. (Tr. 234). However, no disc protrusion or significant central canal stenosis was noted. (Tr. 234).

On March 21, 2007, Claimant went to his physical therapy session and was assessed by his physical therapist Gina Best, MPT, as having right low back and right lower extremity pain, decreased flexibility of the right piriformis, hamstring and bilateral paraspinal muscles, decreased strength of his right lower extremity, an abnormal gait, and an inability to practice as a veterinarian. (Tr. 237-39).

On April 4, 2007, Claimant reported low back pain and difficulty with mobility and ambulation. His strength was noted as five out of five and his sensation was intact, however moderate tightness and tenderness was observed over his lumbar region. (Tr. 227). On May 2, 2007, Claimant saw Dr. Shramowiat with complaints of instability at the left knee and right ankle and pain in the lower right extremity. (Tr. 228). Also on May 2, 2007 and June 20, 2007, Dr. Schwabe again accorded Claimant a GAF score of 80. Again on August 8, 2007, Claimant reported intermittent instability in his right ankle, along with low back pain, pain in the

4

anterolateral right thigh, and pain and swelling in his left groin. (Tr. 229).

On September 12, 2007, Claimant saw Dr. Shramowiat with low back pain and more pain in his right leg. He was found to have a weakly positive straight leg raise and moderate to severe muscle tightness in his lumbar paravertebral region mostly on the right side. (Tr. 230). On October 24, 2007, Claimant was again accorded a GAF score of 80 by Dr. Schwabe, and the doctor also noted that Claimant had lost some weight. (Tr. 246). On November 14, 2007, Claimant continued to complain of low back pain radiating from the right hip into his right knee. His sensation was noted to be intact and it was symmetrical to touch, however moderate tenderness and tightness was found in the lumbar area. (Tr. 231). On December 19, 2007, Claimant was again accorded a GAF score of 80 by Dr. Schwabe.

On February 13, 2008, Claimant still had low back pain radiating into the right hip. He was noted to have moderate tenderness throughout the lower back and over the posterior right hip. (Tr. 232). On May 7, 2008, Claimant again saw Dr. Shramowiat with low back pain, pain in his left leg, pain in his right hip, and difficulty ambulating. He was found to have some paresthesias in the right L5 nerve root distribution and severe muscle tightness in the lumbar paravertebral region bilaterally. (Tr. 233). On September 6, 2008, State Agency Consultant Thomas Lauderman, D.O., completed a Physical Residual Functional Capacity Assessment. (Tr. 253-60). The doctor noted that "[h]e is functional but slow and painful." (Tr. 258). He also found that claimant could occasionally lift 20 pounds, could frequently lift 10 pounds, could stand and/or walk for at least 2 hours in an 8-hour workday, could sit about 6 hours in an 8-hour workday, and that his ability to push and/or pull was limited in the lower extremities. (Tr. 254). On September 8, 2008, Dr. Philip E. Comer, Ph.D., completed a Mental RFC Assessment and

5

concluded that "Claimant's functional limitations do not call for a RFC allowance. He appears to have the mental/emotional capacity for work related activity commensurate with his educational level in a low stress/demand work environment that can accommodate his physical limitations." (Tr. 263). On December 9, 2008, Claimant again saw Dr. Shramowiat with complaints of low back pain, left leg pain, and intermittent shooting pain in the right extremity. The doctor noted pain with palpation, lumbar flexion, extension, side bending, and rotation, and he prescribed Claimant Vicodin. (Tr. 289). On December 30, 2008, Bob Marinelli, Ed.D, affirmed the assessment completed on September 8, 2008. (Tr. 283). On January 6, 2009, Porfirio Pascasio, MD, also affirmed Claimant's RFC assessment. (Tr. 284).

On February 11, 2009, Claimant was noted to be stable and not experiencing any problems with his current medication by Dr. Schwabe. He was again accorded a GAF score of 80. On March 9, 2009, Claimant reported an increase in the severity in his low back pain radiating down to his right lower extremity. Claimant was again prescribed Vicodin and given lumbar trigger point injections. (Tr. 288). On April 29, 2009, Claimant was again accorded a GAF score of 80 by Dr. Schwabe. (Tr. 290). On June 24, 2009, Claimant continued to report low back pain and increased right extremity leg pain. He was found to have moderate to severe muscle tightness in the lumbar paravertebral region and pain with all lumbar range of motion. He was continued on Vicodin and given Celebrex and Robaxin. (Tr. 287). On July 22, 2009 and September 30, 3009 Claimant was again accorded a GAF score of 80 by Dr. Schwabe. On October 5, 2009, Claimant was diagnosed with right lumbar radiculopathy and was given right lumbar trigger point injections. (Tr. 286).

On January 6, 2010, Claimant was again accorded a GAF score of 80 by Dr. Schwabe.

On January 20, 2010, Claimant reported low back pain and phantom left lower extremity pain. He was noted as having lumbar paraspinal tenderness and tightness and it was recommended that he receive additional physical therapy. (Tr. 285). On April 7, 2010, Dr. Schwabe wrote in a medical source statement that Claimant has marked limitations in his ability to deal with work stresses and his ability to maintain attention/concentration. He also noted inattention and poor focusing due to his Attention Deficit Disorder and complicated by his chronic depression. (Tr. 300-302).

D.    Testimonial Evidence

Testimony was taken at the hearing held on May 18, 2010. The following portions of the testimony are relevant to the disposition of the case:

Claimant testified at the hearing that he has had problems with his back all his life. (Tr. 41). However, he testified that after he re-injured it in 2006, "[he] just couldn't work anymore. (Tr. 42). Het testified that he had looked into working for a veterinarian instead of operating his own private practice, but that working for another person is sometimes more demanding than working for yourself. (Tr. 43). He also researching working for pharmaceutical companies but those jobs require a lot of travel which also makes them rigorous. (Tr. 43).

As to his physical limitations, he testified that he has been diagnosed with a disc problem. (Tr. 44). He has an artificial leg, and the strap that hold on the leg goes across his back and aggravates it. (Tr. 44). He also testified that his injury in 2006 "changed the way [he] walked and [he] basically almost had to learn to walk all over again." (Tr. 44). He stated that in the past three years, he has had more falls and near falls than he has had in all his life. (Tr. 44).

He testified that now he has numbness in his hip and right leg. (Tr. 45). He also testified

7

that when he is sitting down, he feels dull pain, and when he stands up he feels a sharp pain above his tailbone, in the center of his lower back, radiating down the right side. (Tr. 45-46). He testified that he takes Celebrex, an anti-inflammatory drug, he takes Vicodin three to four times a week for pain, he receives corticosteroids every three to four months in his spine, and he tries to do exercises or walk. (Tr. 48-49, 51). He also takes Prilosec for stomach pain, but his hiatal hernia and gastric reflux still cause him to have stomach pain once or twice a week. (Tr. 50).

He testified that he can walk for three to four minutes before he has to stop and take a rest. (Tr. 55). He can stand for between two and five minutes but then he has to sit down. (Tr. 55). He can sit for between thirty and forty-five minutes but then he needs to get up and move around. (Tr. 56). He testified that he has arthritis in his hands, his elbow also hurts him, and he occasionally has numbness in his fingers. (Tr. 57).

As to his mental health issues, Claimant testified that he was diagnosed with Attention Deficit Disorder in 2000 and takes Dexedrine to treat it. (Tr. 58). He testified that it causes his attention span to be very limited. (Tr. 59). He also testified that he has been struggling with depression since he was twenty-one years old. (Tr. 60). He testified that it causes him to have a lack of interest, to get tired easily, and to entertain thoughts of suicide. (Tr. 60). He takes Prozac to manage his depression and he sees his counselor every two months. (Tr. 62). He testified that he was having emotional problems at his job, which included losing his patience with his clients and their pets. (Tr. 67).

At the hearing, a vocational expert ("VE") also gave testimony. The ALJ posed the following hypothetical to the VE:

> [A]ssume a hypothetical individual the same age, education and work experience as the Claimant, who retains the capacity to perform light work with the following

8

limitations. Can perform all postural movements occasionally, except cannot climb
ladders, ropes or scaffolds; is limited to jobs that do not require the operation of foot
controls; must avoid exposure to temperature extremes, to excessive vibrations and
to hazards; is limited to low-stress jobs involving no production rate or pace work.
Can such an individual perform any of the past work of the Claimant?

(Tr. 69-70)

> The VE then responded no.
>
> The ALJ then asked if there are other jobs in the regional or national economy that such

an individual can perform, and the VE responded:

> There would be the work of a storage facility rental clerk. In the local economy,
> there are 185 jobs, in the national economy 179,260 jobs...There would be the work
> of a mail clerk. That would be an individual working in a mailroom of a business, as
> opposed to working for the Postal Service. In the local economy there's 61 jobs, in
> the national economy 70,832 jobs...There would be the work of a packer. In the local
> economy there are 297 jobs, in the national economy 468,024 jobs.

(Tr. 70)

The ALJ then added additional limitations to the first hypothetical that he posed to the VE:

> [A]ssume that same hypothetical individual with the following added limitations.
> The individual must be permitted to change positions briefly between sitting and
> standing or walking every 30 minutes throughout the workday. The individual is
> limited to standing or walking no more than a total of five hours in an eight-hour
> workday. The individual is limited to occupations with no more than occasional
> interaction with the public, co-workers, and supervisors. The individual cannot
> perform jobs that require ambulation on uneven terrain and the individual cannot
> kneel or crouch. Are there jobs in the regional or national economy such an
> individual can perform?

(Tr. 70-71)

The VE responded:

> The work of a storage facility rental clerk would still be appropriate for this
> hypothetical. The numbers would remain the same...Similarly, this individual could
> work as a mail clerk. Again, the numbers would remain the same. There would be
> the work of a sewing machine operator. In the local economy there are 30 jobs, in the
> national economy 60,507 jobs.

(Tr. 71)

Then the ALJ asked:

[A]ssume alternatively that same hypothetical individual who can, instead, perform sedentary work with the same non-exertional limitations that I provided to you previously. Are there jobs that such an individual can perform?

(Tr. 71-72)

The VE responded:

[T]here would be the work of a surveillance system monitor. In the local economy there's 16 jobs, in the national economy 25,366 jobs. There would be the work of a...document preparer. In the local economy there are 207 jobs, in the national economy 143,297 jobs...There would be the work of an ampoule sealer. In the local economy there are 20 jobs, in the national economy 32, 278 jobs.

(Tr. 72)

Claimant's attorney also questioned the VE, and asked him:

[I]f Claimant were only able to stand and walk in combination for two hours out of an eight-hour day, would that have any bearing on the jobs you had named, of storage rental facility clerk, mail clerk and packer?

(Tr. 73)

The VE responded:

[T]he individual could still do the work as a sewing machine operator. Would not be able to do the work as a mail clerk, nor would that person be able to do the work as a storage facility rental clerk.

(Tr. 73)

Claimant's attorney then asked:

[I]f the Claimant were unable to – or if here were off-task for up to two hours of an eight-hour workday and unable to concentrate due to a combination of distraction from pain and attention deficit disorder, would he be able to maintain any of the jobs you've named, if he were off-task up to two hours of the day?

(Tr. 73-74)

The VE responded that there would be no jobs.

Claimant's attorney then asked if there would be any jobs at the sedentary level, with a sit/stand option every 30 minutes, no production quotas, occasional interaction with co-workers and the public, and if they could change posture and go back to the original posture at will.

(Tr. 74)

10

The VE responded:

> [I]f an individual were required to engage in a sit/stand option at will, in sedentary jobs, that generally would be disruptive to doing the job and if the individual were to be off-task more than ten percent of a work period on an ongoing basis, they would lose their job.

(Tr. 74-75)

E.  Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

Claimant is married and lives together with his wife. (Tr. 37). On a typical day, he gets up, exercises, and takes a hot bath. (Tr. 62). Then, some days he will go on a walk, and some days he will read or watch television. (Tr. 62). On most days, he testified that he reads for between three and four hours. (Tr. 63). He also occasionally uses his riding mover to take care of the yard. (Tr. 64). He testified that he only sleeps between four and five hours each night and that it is broken sleep. (Tr. 62).

He has a driver's license and is able to drive. (Tr. 38). He has two sisters in the area and they are able to come and help him occasionally. (Tr. 65). He sometimes attends church with his wife, and they occasionally will go to dinner or a movie together. (Tr. 65). He will also sometimes help the Humane Society by giving them a phone consultation if they are not sure what to do with a sick animal. (Tr. 66).

### III.  The Motions

A.  Contentions of the Parties

Claimant's brief alleges that the ALJ erred in not properly assessing Claimant's residual

functional capacity.

The Commissioner contends that substantial evidence supports the ALJ's residual functional capacity determination and therefore his decision was not erroneous.

B.  The Standards.

1.  Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.  Judicial Review. Only a final determination of the Commissioner may receive judicial review. See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

C.  Discussion

1.  Whether the ALJ Erred in Not Properly Assessing Claimant's Residual Functional Capacity

Claimant asserts that the ALJ erred in determining his RFC. He claims that the ALJ's RFC determination did not incorporate all of Claimant's limitations imposed by all of his

12

significant impairments, and thus the VE testimony elicited and his decision are erroneous. Commissioner counters that the ALJ had sufficient evidence to properly determine Claimant's RFC.

First, this Court notes that its review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3) (2010). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 664-65 (1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the Claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3).

As to Claimant's argument that the ALJ did not properly assess Claimant's residual functional capacity, at step four of the sequential analysis, the ALJ must determine Claimant's RFC. 20 C.F.R. § 404.1520. An RFC is what a claimant can still do despite his limitations. 20 C.F.R. §§ 404.1545, 416.945. RFC is an assessment based upon all of the relevant evidence. Id. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of claimant's medical condition. Id. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of claimant's limitations may be used. Id. These descriptions and observations must be considered along with

medical records to assist the SSA to decide to what extent an impairment keeps a claimant from performing particular work activities. Id.

The Fourth Circuit Court of Appeals has held an ALJ is not required to include work-related limitations into a residual functional capacity assessment when those limitations are not supported by the record. Gross v. Heckler, 785 F.2d 1163, 1165 (4th Cir. 1986). Additionally, while questions posed to the vocational expert must fairly set out all of the Claimant's impairments, the questions need only reflect those impairments supported by the record. Russell v. Barnhart, 58 Fed. Appx. 25, 30 (4th Cir. Feb. 7, 2003). The Court further stated that the hypothetical question may omit non-severe impairments but must include those that the ALJ finds to be severe. Id. Moreover, based on the evaluation of the evidence, "an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a Claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ." France v. Apfel, 87 F. Supp. 2d 484, 490 (D. Md. 2000) (citing Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir.1986)).

In this case, The ALJ found that Claimant has the RFC to perform:

> a range of unskilled work activity that: requires no more than a "light" level of physical exertion; entails standing or walking for no more than five hours in an eight hour work day; accommodates a change of position briefly between sitting and standing/walking every 30 minutes during a standard eight hour workday; entails no climbing of ropes, ladders or scaffolds and no more than occasional performance of other postural activities; entails no ambulation on uneven terrain; entails no operation of foot controls with the left lower extremity; entails no exposure to temperature extremes, excessive vibration, or hazards (e.g. dangerous machinery, unprotected heights); entails low stress environments involving no production rate or pace work; and entails no more than occasional interaction with others.

(Tr. 18).

The ALJ's RFC determination was based on substantial evidence. First, the ALJ went

through the substantial evidence that supported his decision not to entirely credit Claimant's subjective statements concerning his symptoms and limitations in determining his RFC. The ALJ noted that although his claims his impairments limited his ability to maintain employment since September 28, 2006, he did not file for disability benefits until June 18, 2008. (Tr. 18). Second, the ALJ noted that Claimant's activities indicate he overstated the severity of his condition, noting that he could do laundry, ride on a mower, drive, read, watch T.V. and walk in the woods. (Tr. 19). Based on this substantial evidence, the ALJ decided not to credit Claimant's symptoms to the frequency or degree of severity alleged when determining his RFC.

Second, the ALJ went through the medical evidence of record in order to support his RFC determination, noting that it is not indicative of a disabling condition that would make Claimant unable to engage in sustained employment. Notably, the ALJ cited to a visit to Anna M. Allen, M.D. on October 30, 2006, during which his gait was noted to be normal and he was not found to be in acute distress. (Tr. 19). The ALJ noted that on December 18, 2006, Claimant reported improvement with his low back and lower extremity pain, and upon examination, his right lower extremity strength was five out of five and his straight leg testing was negative. (Tr. 20). When Claimant went to see Michael Shramoviat, M.D., his straight leg testing was negative. (Tr. 20). A February 14, 2007 MRI showed had no focal disc protrusion or significant central canal stenosis. (Tr. 20). On February 21, 2007, Tamar Rhodes, M.S.N., C.F.N.P and Dr. Shramoviat reported that Claimant only occasionally took Vicodin. (Tr. 20). On March 23, 2007, Claimant denied significant low back or right lower extremity pain in sitting and stated that he was able to drive himself to the appointment. (Tr. 20). On March 28, 2007, Claimant reported that his physical therapy session helped him with his back and that he was moving a lot easier.

15

(Tr. 20). On April 4, 2007, his strength was reported as five out of five and his sensation was intact, and again on August 8, 2007 his strength was five out of five. (Tr. 20-21). On September 12, 2007, Claimant right lower extremity examination was normal. (Tr. 21). On November 14, 2007, his sensation was noted intact and his straight leg test was negative. (Tr. 21). On February 13, 2008 and May 7, 2008, and March 9, 2009, his strength was five out of five. (Tr. 21). On June 24, 2009, his right lower extremity was noted as normal with a negative straight leg raise. In light of this evidence, the ALJ concluded that he "does not believe that such findings are indicative of any intractable condition that would preclude the claimant from performing 'light' work activity for 12 consecutive months subject to the parameters articulated in the above Residual Functional Capacity."

The ALJ further supported his decision by also considering Claimant's daily activities. He stated stating that Claimant testified that he could exercise, go for walks in the woods, lift 30 to 40 pounds with his arms, and was able to lift 20 to 25 pounds when bending over to pick something up. Accordingly, the ALJ stated that the RFC adequately accommodated for any limitations to which Claimant is subjected.

Finally, the ALJ supported his decision to credit the RFC assessments completed by State Agency Consultants Thomas Lauderman, D.O. and Porfirio Pascasio, M.D., explaining that they are "generally based upon the full longitudinal record." (Tr. 23). Accordingly, the ALJ properly creditied Dr. Lauderman's assessment that Claimant has a "light physical exertional capacity [and the] ability to stand and/or walk for at least two hours in an eight hour work day and sit for about six hours in an eight hour work day." (Tr. 23). In sum, the ALJ was required to formulate the RFC assessment based on all of the evidence in the record, and he did that here. Therefore,

16

the ALJ properly determined claimant's RFC.

As to Claimant's final argument that the ALJ did not pose a proper hypothetical to the VE, while questions posed to the vocational expert must fairly set out all of the Claimant's impairments, the questions need only reflect those impairments supported by the record. <u>Russell v. Barnhart</u>, 58 Fed. Appx. at 30 (4th Cir. Feb. 7, 2003). For the reasons outlined above, the undersigned finds that the RFC included in the hypothetical posed to the VE was proper because it was supported by substantial evidence.

For the above reasons, Claimant's assertions do not warrant relief.

### IV. Recommendation

For the foregoing reasons, I recommend that:

1. Claimant's Motion for Judgment on the Pleadings be **DENIED.**

2. Commissioner's Motion for Summary Judgment be **GRANTED**.

Any party who appears *pro se* and any counsel of record, as applicable, may, on or before **June 5, 2012**, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: May 22, 2012

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE